FIRST JUDICIAL DISTRICT COURT
COUNTY OF SANTA FE
STATE OF NEW MEXICO

**ENDORSED**
First Judicial District Court

No. D-0101-CV-2009-_02728_    mjs

AUG 20 2009

Santa Fe, Rio Arriba &
Los Alamos Counties
PO Box 2268
Santa Fe, NM 87504-2268

ERIC DISTEFANO, and SARA DISTEFANO,

     Plaintiffs,

     v.

JOSÉ CORNEJO, a New Mexico resident, and
ALLSTATE INSURANCE COMPANY, a foreign insurer,

     Defendants.

---

## COMPLAINT FOR BREACH OF AN INSURANCE CONTRACT, FOR BAD FAITH FAILURE TO PAY A FIRST PARTY CLAIM, BAD FAITH FAILURE TO CONDUCT A GOOD FAITH INVESTIGATION, AND FOR VIOLATION OF THE NEW MEXICO INSURANCE TRADE PRACTICES AND FRAUDS ACT

---

COME NOW, the Plaintiffs and state upon information and belief:

### GENERAL ALLEGATIONS

1.      Plaintiff ERIC DISTEFANO and Plaintiff SARAH DISTEFANO ["Plaintiffs"] are residents of Santa Fe County, New Mexico. The events, transactions and occurrences which give rise to the claims alleged herein also occurred or arose in Santa Fe County, and/or occurred or arose in connection with or in respect to the property located in Santa Fe County, making venue for this action proper in Santa Fe County, New Mexico.

2.      Defendant ALLSTATE INSURANCE COMPANY, ["Allstate"], is a foreign insurance company duly licensed to do business within the State of New Mexico pursuant to the rules and regulations promulgated by the New Mexico Superintendent of Insurance, the

BERARDINELLI
Law Firm

**EXHIBIT**

_A_

New Mexico Insurance Code, including as part thereof, the Insurance Trade Practices and Frauds Act ["ITPFA"], NMSA 1978, Section 59A-16-1 through 59A-16-30, the Unfair Claims Practices Act ["UCPA"], NMSA 1978, Section 59A-16-20, and all other applicable New Mexico statutes and case law.

3.    Allstate's statutory agent for service of process is the New Mexico Superintendent of Insurance. As a foreign insurer, Allstate may be found and served with process in Santa Fe County, New Mexico, by service upon the New Mexico Superintendent of Insurance, as its statutory agent for service of process.

4.    Allstate owns all the stock of every Allstate Insurance Company subsidiary licensed to do business in New Mexico, including **ALLSTATE INDEMNITY COMPANY** ["AIC"]. AIC is a non-party joint venturer with Allstate and is a wholly owned subsidiary of Allstate. Allstate is AIC's alter ego. *See* Exhibit 1, A. M. Best 2002 Report for Allstate Insurance Group, at 2-4 attached ("Rating Rationale: The rating applies to Allstate Insurance Company and nine of its reinsured subsidiaries [including AIC]...Corporate Overview: Allstate Insurance Group, led by Allstate Insurance Company, is primarily engaged through its subsidiaries in personal property/casualty and life insurance.").

5.    Under certain agreements between Allstate and AIC, AIC "cedes" all of its premium income to Allstate and in return, Allstate pays all of AIC's claims and expenses of any kind.

6.    AIC is essentially a "shell" company for Allstate. AIC has no employees. All members of AIC's Board of Directors are employees of Allstate. AIC employs no underwriting, marketing, regulatory, legal or claims handling employees.

7.    As part of its agreements with Allstate, employees of Allstate's Claims Organization known as, or formerly known as, P-CCSO ["Property-Casualty Claims Service

BENARDINELLI
Law Firm

-2-

1    Organization"] are the persons who actually perform all of AIC's insurance claim handling

2    functions and contractual obligations.

3       8.    Allstate employees also perform all of AIC's underwriting and regulatory

4    functions [including approving or denying AIC applications, issuing AIC policies, writing AIC

5    policies, and complying with all of AIC's statutory filing and licensing duties within New

6

7    Mexico].

8       9.    Further or alternatively, Allstate and APC stand in the position of principal

9    [Allstate] and agent [APC]. *Id.*

10      10,    AIC is one of eight reinsured wholly owned subsidiaries of Allstate. *Id.* Allstate's

11   status as alter ego for AIC is established by the following:

12

13         a.    Allstate owns all of AIC's stock;

14         b,    Allstate receives all of AIC's income;

15         c.    Allstate pays all of AIC's claims and expenses;

16         d.    Allstate controls and employs all of AIC's Board Of Directors;

17         e.    Allstate controls, directs, manages and/or employs all persons or agents selling

18              and/or issuing all of AIC property-casualty ["casualty"] policies issued in New

19              Mexico, including AIC homeowner policies;

20

21         f.    Allstate employees perform all of AIC's underwriting functions with respect to

22              every AIC casualty policy [including all homeowner's policies] issued in New

23              Mexico and are the persons who actually create and issue AIC casualty policy

24              applications in New Mexico, approve or reject all applications for AIC casualty

25              policies in New Mexico, make all of AIC's underwriting decisions including, but

26              not limited to, rating decisions with respect to a every AIC casualty policy issued

27              in New Mexico including AIC homeowner policies;

28

BERARDINELLI
Law Firm

-3-

g.  Allstate employees determine and control the procedures used in New Mexico for the sale of AIC homeowner policies issued in New Mexico;

h.  Allstate employees perform all of AIC's statutory, administrative and/or regulatory functions and filings required of AIC as a foreign insurer licensed to do business in New Mexico under the Insurance Code and/or the administrative regulations issued by the New Mexico Superintendent of Insurance ["the Superintendent"], including, but not limited to, preparing and filing all of AIC's financial statutory filings and reports in New Mexico, preparing and filing all of AIC's requests for approval of casualty policy forms used by AIC in New Mexico, preparing and filing all of AIC's requests for casualty coverage premium rate changes with respect to every AIC casualty policy issued in New Mexico, and every other similar AIC regulatory or administrative duty or function in New Mexico; and

i.  Allstate employees perform all of AIC's claim handling functions and contractual obligations under all of AIC casualty policies [including homeowner policies] issued in New Mexico including, but not limited to, the investigation and determination of coverage disputes regarding claims arising under AIC casualty policies, and the investigation, evaluation and settlement of all claims arising in New Mexico under AIC casualty policies, including all functions of Allstate's Special Investigative Unit ["SIU"] responsible for handling and investigating all so-called "fraudulent" homeowner claims allegedly made by AIC policyholders in New Mexico.

11.  Defendant JOSE CORNEJO ["Cornejo"] is a New Mexico resident. Cornejo is employed by Allstate as its Market Claims Manager ["MCM"] for Allstate's Albuquerque

SCHARDINELLI
Law Firm

-4-

"Market Claims Office" ["MCO"]. Cornejo has been employed by Allstate as the MCM for its Albuquerque MCO since 1996.

12.   As the Albuquerque MCM, Cornejo is the person ultimately and directly responsible for the implementation and enforcement of Allstate's Claims Core Process Redesign ["CCPR"] claim handling practices, procedures and protocols in New Mexico, including all SIU referral goals and SIU claim handling/investigation practices, procedures and protocols used by Allstate employees handling all New Mexico AIC homeowner claims arising under AIC homeowner policies issued in New Mexico.

13.   As the Albuquerque MCM, Cornejo is also personally and ultimately responsible for ensuring that Allstate employees handling all of AIC homeowner claims arising under New Mexico AIC homeowner policies comply with all requirements for fair, prompt and equitable claim practices set forth in the New Mexico UCPA while handling every New Mexico homeowner claim made under a New Mexico AIC homeowner's policy.

14.   As the Albuquerque MCM, Cornejo is also personally and ultimately responsible and/or liable for all claim handling activities, functions or actions performed by Allstate employees while handling any New Mexico AIC homeowner claim arising under an AIC homeowner policy issued in New Mexico which violate or are defined as unfair, deceptive or fraudulent under the New Mexico UCPA and the New Mexico ITPFA.

15.   At all times relevant hereto, Cornejo was a "person" subject to the terms and regulations of the New Mexico Insurance Code, including, as parts thereof, the New Mexico Insurance Trade Practices and Frauds Act, NMSA 1978, Section 59A-16-1 through 59A-16-30, and the New Mexico Unfair Claims Practices Act, NMSA 1978, Section 59A-16-20.

16.   Plaintiffs are designated as the "Named Insured" under a certain Homeowner's Insurance Policy issued by Allstate in the name of AIC, to wit: Policy No. 000944501142 ["the policy"].

BERARDINELLI
Law Firm

17.     The policy provides homeowner's coverage protection for the property and residence located at 34 Violet Circle, Santa Fe, New Mexico ["the residence"]. The policy also provides coverage for property damage and loss of personal property resulting from burglary and theft. *See* Exhibit 2, attached [copy of a sample policy, provided by Allstate adjuster until a certified copy of Plaintiffs' policy can be obtained.]

18.     The policy was in force and effect at all times applicable and relevant to events and controversies alleged herein.

19.     As a supplier of a public service rather than a manufactured product, Allstate's obligations to Plaintiffs went beyond the mere payment of coverage when forced to do so. Allstate's duties of good faith and fair dealing encompassed qualities of decency and humanity inherent in the responsibilities of a fiduciary.

20.     The business of casualty insurance is affected with a public interest. Casualty insurers, such as Allstate, supply a vital public service. Casualty Insurance constitutes a fund of assurance and credit—a financial "safety net"—relied upon by the public, and by policyholders such as Plaintiffs, to provide a reasonably accessible source for prompt, full and fair indemnification from unexpected and unintended property losses.

21.     As a supplier of a service affected with a public interest, Allstate must take seriously the interests of the public, in general, and its policyholders, in particular. Allstate is precluded by law from placing its own interest in maximizing gains and limiting disbursements above the interests of the public and its policyholders, such as Plaintiffs.

22.     A special and unique relationship existed at all times alleged herein between Allstate and Plaintiffs due to the inherent lack of balance in, and adhesive nature of, the relationship, the quasi-public nature of insurance, and the potential for Allstate to unscrupulously exert its unequal bargaining power at a time when Plaintiffs are particularly vulnerable—at the time of a covered loss.

BERARDINELLI
Law Firm

-6-

23.    Allstate is precluded by the laws of New Mexico from leveraging its financial superiority over innocent policyholders, such as Plaintiffs, at the moment when they are most vulnerable, through the design and implementation of claim handling programs and protocols, specifically SIU protocols, intended primarily to harass and intimidate Plaintiffs into abandoning their legitimate claims for benefits under the policy as a method for unscrupulously boosting profits.

24.    Allstate owed Plaintiffs a fiduciary duty to perform its express and implied obligations under the policy with the utmost good faith. Allstate also owed Plaintiffs a fiduciary duty to give equal consideration to Plaintiffs' interests.

25.    Allstate's duty of equal consideration required Allstate to resolve all reasonable doubts about coverage for Plaintiffs' claims in Plaintiffs' favor—not in its own favor as a means of achieving profit goals by the intentional underpayment of legitimate policyholder claims.

26.    Allstate knew at the time the policy was issued that Plaintiffs did not purchase the policy to gain commercial advantage but instead to gain protection, peace of mind and security against calamity.

27.    Allstate owed Plaintiffs a fiduciary duty of utmost good faith not to do anything to delay, hinder, harm or deny Plaintiffs' right to receive the full and fair benefits of the policy.

28.    At all times alleged herein, Plaintiffs had the right to expect trust and confidence in the integrity and fidelity of Allstate.

29.    Acting through Cornejo, Allstate implemented SIU protocols and referral goals, employee performance management/measurement/review systems, and incentive/bonus programs in New Mexico which created incentives for Allstate's claims employees to deny, delay and minimize legitimate New Mexico homeowner claims made under AIC homeowner policies like the policy issued to Plaintiffs in this case.

-7-

## GENERAL FACTUAL ALLEGATIONS

30.    Allstate has designed and operates its SIU fraud units to operate as "profit centers" which generate illicit claims profits by intentional underpayment of a large number of claims Allstate knows or should know to be legitimate.

31.    Allstate sets "Dollars-Not-Paid" performance measurements and goals for all its SIU employees, the primary purpose of which is to generate illicit claims profits through the deliberate denial and/or underpayment of legitimate New Mexico casualty claims. Allstate's SIU employees are thus measured, incented, encouraged and rewarded for *not* paying claims— including claims Allstate knows or should know are legitimate claims.

32.    Allstate's SIU employees and supervisors are encouraged, measured, incented and rewarded for delaying and/or denying and/or refusing to make timely, reasonable settlement offers on any claim referred to the SIU for as long as possible—including claims Allstate knows or should know are legitimate claims.

33.    Allstate has established SIU "referral goals" for all New Mexico claims, including homeowner claims. Allstate's SIU referral goals for New Mexico, and the standards established by Allstate for making such referrals are unfair and deceptive practices designed primarily to classify numerous New Mexico casualty claims which Allstate knows or should know are legitimate as "fraudulent" SIU claims.

34.    Allstate uses SIU homeowner referral goals, and the unfair and deceptive standards established by Allstate for such referrals, primarily to generate illicit claims profits by applying Allstate's SIU protocols to innocent policyholders making legitimate casualty claims in order to extort and harass such policyholders into abandoning their right to receive

Berardinelli
Law Firm

-8-

1   the full benefits promised by their policies rather than endure the brutal, invasive, criminalized
2   and unwarranted SIU tactics to which Allstate subjects them.

3       35.   Cornejo is directly and personally responsible [as one of his performance
4   measurements/goals for purposes of bonuses and other performance based incentives] for
5   ensuring that all adjusters handling New Mexico casualty claims, including homeowner claims,
6   meet the SIU referral goals set for New Mexico.

7       36.   Cornejo's overall responsibility for supervising and encouraging adjusters
8   handling New Mexico casualty claims to meet his New Mexico SIU referral goals for casualty
9   claims proximately caused Plaintiffs' legitimate homeowner claims to be wrongly referred to
10  the SIU for handling without any reasonable or proper factual basis or any good faith
11  investigation whatsoever of the facts underlying Plaintiffs' claims.
12
13      37.   Allstate's SIU referral goals for New Mexico casualty claims, including
14  homeowner claims, as well as its unfair and deceptive standards for such referrals, encourage,
15  incent and reward adjusters handling New Mexico homeowner claims to refer legitimate
16  homeowner claims made by New Mexico innocent policyholder to the SIU for handling
17  without an adequate, good faith investigation of the actual facts underlying the claim and
18  without any reasonable, good faith basis for such referrals which result in brutal, excessive,
19  extortionist, and criminalized investigation of the claims of such policyholders.
20
21      38.   Allstate knows a substantial number of the claims referred to the SIU for handling
22  are not actually fraudulent as that term is defined by law and understood by the ordinary
23  policyholder.
24
25      39.   Nevertheless, Allstate has intentionally designed its SIU protocols so as to prevent
26  *any* policyholder whose claim is referred to the SIU from receiving a *prompt* payment of
27  benefits legitimately due under his or her policy.
28

BERNARDINELLI
Law Firm

-9-

012/077

40.   All claimants referred to Allstate's SIU for investigation and handling are subjected to Allstate's SIU protocols designed to criminalize, intimidate, extort and harass the claimants into abandoning their legitimate claims—even if a reasonable investigation would show [or does actually show] such claims are in fact legitimate and not fraudulent.

41.   Once a policyholder's claim is referred to the SIU, even if Allstate knows or should know the claim is legitimate, the claim will permanently remain assigned to the SIU, never be reassigned back to a regular claim handling unit, and will be handled under SIU protocols regardless of the facts or merits of the case.

42.   One of the prime objectives of Allstate's SIU claim handling and litigation protocols is to make achieving any payment of benefits by the policyholder for a legitimate claim as difficult, lengthy, expensive, brutal, humiliating, accusatory and unpleasant as possible—even when Allstate knows or should know there was never a legitimate, good faith factual basis for referring the policyholder's claim to the SIU in the first place.

43.   Another prime objective of Allstate's SIU protocols is to force the policyholder to institute and pursue litigation through jury trial and final judgment—including nearly universal appeals from any verdict in the policyholder's favor—as the only available means of obtaining fair payment, or any payment, for their claim [above a nominal sum].

44.   The policy provides homeowner coverage for the residence. The policy also provided Plaintiffs with coverage and protection for loss of personal property from the residence caused by or resulting from theft or conversion.

45.   At some time between March 12 and March 18, 2009, while Plaintiffs were temporarily away from the residence visiting relatives and friends, a person or persons unknown to Plaintiffs entered the residence without Plaintiffs' knowledge or permission by prying open the back door to their workout/exercise room ["point of entry"] of the residence.

BERARDINELLI
Law Firm

-10-

1   The back door, which was the point of entry, is situated on the residence so that entry through

2   that door could not be seen by Plaintiffs' neighbors.

3        46.    During this burglary, the intruder(s) removed from the residence a number of

4   small, highly portable and valuable items of personal property belonging to Plaintiffs,

5

6   including watches and jewelry among other things, all again without Plaintiffs' knowledge or

7   permission.

8        47.    Upon Plaintiffs' return to the residence, Plaintiffs noticed the back door to their

9   workout/exercise room was ajar and the home alarm was off. Although it is their normal

10   custom to do so, Plaintiffs could not upon their return, and still cannot recall or be certain as to

11

12   whether one of them actually turned the alarm on when they left the residence on March 12,

13   2009.

14        48.    Other than the back door being ajar, Plaintiffs did not immediately notice

15   anything amiss at the residence or that the stolen items of personal property were in fact

16   missing from the residence. Later, Plaintiffs discovered that the lock of the back door, which

17   was the point of entry for the burglary, was broken and could not be properly closed because it

18   was out of alignment.

19

20        49.   Over the course of the next week, Plaintiffs began to discover that a number of

21   their items of personal property had been stolen from the residence. On or about March 25,

22   2009, Plaintiffs reported the burglary to the Santa Fe County Sherriff's office.

23        50.    On or about March 26, 2009, Plaintiffs reported the claim to Allstate.

24        51.    By March 30, 2009, Plaintiffs' claim had been referred to the SIU for handling,

25   despite the fact that only four days had passed since the claim was reported and no legitimate,

26   good faith investigative inquiry into the actual facts had been made by Allstate.

27

28        52.    At no time between March 26, 2009, and March 30, 2009, did any Allstate

BERARDINELLI
Law Firm   adjuster, investigator or agent visit Plaintiffs' residence to physically examine the residence.

-11-

53.   At no time prior to the referral of Plaintiffs' claim to the SIU fraud unit did anyone working for Allstate physically examine the back door to the exercise room or observe the clear signs of forced entry and damage evident at this point of entry.

54.   An objective, fair investigation of the premises, including an actual physical examination of the back door to Plaintiffs' exercise room, would have revealed to a knowledgeable, experienced investigator that the back door had been pried open and was out of alignment as a result of a forced break in. The point of entry door displayed pry marks, and missing wood near the pry marks, typical of forced entry into the residence.

55.   At no time has Allstate made any attempt to conduct a fair and reasonable investigation, giving equal consideration to Plaintiffs' interests. By March 30, 2009, four days after the claim was reported, Allstate had already made its determination that Plaintiffs' claim was fraudulent and has since that time investigated Plaintiffs' claim as a criminal act of insurance fraud—with the sole intent of denying Plaintiffs' claim and coverage without any attempt to conduct an actual investigation into the facts which support Plaintiffs' claims.

56.   As an example of Allstate's predetermined decision to deny Plaintiffs' claims, on March 30, 2009, Allstate demanded that Plaintiffs execute an information release allowing Allstate unfettered access to all of Plaintiffs' records from "credit bureaus, consumer reporting agencies, financial institutions, governmental agencies (*including law enforcement agencies*), *fire department,* insurance company representatives, *utility companies, public and private employers,* and *employees of any of the above.*" *See* Exhibit 3, attached.

57.   At the time Allstate demanded unfettered, uncontrolled access into Plaintiffs' lifetime histories and records concerning their credit, banking history, criminal investigations, fire department records, all government agencies [including the state and federal tax authorities], utilities, and every employer during each of their lifetimes, Allstate had still never

BERARDINELLI
Law Firm

-12-

bothered to visit the residence or examine the evidence of forced entry apparent at the back door to the exercise room.

58.    Under these circumstances existing on March 30, 2009, Allstate had no reasonable, good faith basis for demanding unfettered access to a lifetime of Plaintiffs' personal and private information, most of which was entirely irrelevant to any good faith investigation of Plaintiffs' claims.

59.    Under these circumstances existing on March 30, 2009, Allstate's predetermination that Plaintiffs' claims were fraudulent—without any attempt at actual investigation of the evidence proving the fact of forced entry—and its demand for cooperation by allowing unwarranted, unfettered access to Plaintiffs' lifetime personal, financial, utility and employment information and records were a direct and egregious violation of the fiduciary duty of good faith and fair dealing Allstate owed to Plaintiffs.

60.    Under these circumstances existing on March 30, 2009, Allstate's predetermination that Plaintiffs' claims were fraudulent—without any attempt at actual investigation of the evidence proving the fact of forced entry—and its demand for cooperation by allowing unwarranted, unfettered access to Plaintiffs' lifetime personal, financial, utility and employment information and records amounted to a fraudulent, unfair and deceptive insurance claim practice.

61.    Under these circumstances existing on March 30, 2009, Allstate's conduct amounted to a clear breach of its duties and obligations under the policy thus relieving Plaintiffs of any duties under the policy.

62.    On or about April 20, 2009, Allstate received a verified proof of loss from Plaintiffs in the amount of $21,164.95, to which it never responded in accord with SIU protocols and its predetermined conclusion that Plaintiffs' claims were fraudulent.

BERARDINELLI
Law Firm

63.     On or about April 23, 2009, Plaintiffs informed Allstate by letter they were being represented by counsel. Plaintiffs requested a copy of Allstate's investigative file as well as a confirmation or denial that Plaintiffs' claim had been referred to the SIU and was then being investigated as a "fraud" claim.

64.     On June 3, 2009, Allstate sent Plaintiffs a letter which in effect denied coverage claiming Plaintiffs had failed to give Allstate a recorded interview when it was clear that Allstate was not investigating Plaintiffs' claim in good faith but was using its investigation under SIU protocols solely to harass, humiliate, extort, and criminalize Plaintiffs in order to find further reasons to deny their legitimate claims.

65.     Allstate's referral of Plaintiffs' claims to the SIU without any investigation, as well as its conduct in the investigation of this claim amounted to an outright denial of Plaintiffs' claims [meaning an offer of $0 for Plaintiffs' claims] for reasons that were unreasonable and unfounded, which denial and refusal to pay has now forced Plaintiffs to file this litigation to obtain their legitimate benefits due under the policy. Under Allstate's SIU protocols, Allstate has now determined to intentionally abuse the judicial processes of this Court during the litigation of this claim for an improper purpose of harassing, delaying and extorting Plaintiffs to abandon their claims, and to further abuse the trial process itself by forcing Plaintiffs to litigate this claim to final verdict as the only possible means of obtaining any of the benefits due them under the policy.

## COUNT I
## BREACH OF CONTRACT

66.     All of the general and factual allegations recited above are incorporated herein by reference.

BERARDINELLI
Law Firm

-14-

67.   As described above, Allstate has willfully breached its insurance contract with Plaintiffs by intentionally and in bad faith failing to act reasonably under the circumstances to conduct a timely and fair investigation and evaluation of Plaintiffs' legitimate claims for the policy benefits due under the terms of the policy for the loss of their personal property due to the burglary of their residence.

68.   Allstate willfully breached its insurance contract by intentionally and in bad faith failing to promptly and in good faith pay Plaintiffs for the loss of their personal property due to the burglary of their residence.

69.   Allstate willfully breached its insurance contract by refusing to pay Plaintiffs' legitimate property loss claims for reasons which were, under the circumstances, unreasonable and unfounded.

70.   As a direct and proximate result of Allstate's willful breach of its insurance contract with Plaintiffs and its bad faith failure to pay Plaintiffs' legitimate first-party claims, Plaintiffs have suffered pecuniary losses, non-pecuniary losses and damages, all in amounts to be proved at trial.

71.   Allstate's actions as alleged herein with respect to the investigation, evaluation and payment of Plaintiffs' legitimate policy claims were wanton, malicious, intentional, and in reckless disregard for Plaintiffs' rights amounting to a willful, malicious and bad faith breach of its contractual duties and obligations under its insurance contract with Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages in amounts sufficient to punish and deter Allstate from similar conduct in the future.

BERNARDINELLI
Law Firm

-15-

## COUNT II
### COMMON LAW BAD FAITH CLAIMS

72.    All of the general and factual allegations recited above are incorporated herein by reference.

73.    At all times during the investigation of Plaintiffs' legitimate claims under the policy, Allstate had a duty to act honestly and fairly, giving equal consideration to the interests of the Plaintiffs as the premium paying policyholders, independent of any contractual duty to ultimately pay some or all of Plaintiffs' claims.

74.    Further, Allstate had the duty not to act so as to interfere with, obstruct, delay, defeat, minimize or diminish Plaintiffs' right to receive the full benefits of their policy.

75.    Irrespective of any actual duty to pay, the actions of Allstate during the claim handling process, especially its immediate, unfounded and unreasonable referral of Plaintiffs' claims to the SIU, violated Allstate fiduciary duties of good faith, fair and honest treatment and equal consideration owed to Plaintiffs.

76.    Allstate intentionally, in violation of its fiduciary duty of good faith and fair dealing, and/or in bad faith failed to act reasonably under the circumstances to conduct a timely and fair investigation and evaluation of Plaintiffs' legitimate policy claims for the loss of their personal property due to the burglary of their residence covered under the policy.

77.    Allstate intentionally, in violation of its fiduciary duty of good faith and fair dealing, and/or in bad faith failed to promptly and fairly evaluate and fully pay Plaintiffs' legitimate property claims under the policy.

78.    Allstate refused to pay Plaintiffs' legitimate property claim for reasons which were and are, under the circumstances, unfounded and/or unreasonable.

BERARDINELLI
Law Firm

-16-

79.    As a direct and proximate result of Allstate's bad faith failure to pay Plaintiffs' legitimate first-party claims as well as its bad faith failure to conduct a timely, good faith investigation of Plaintiffs' claims for first party insurance benefits, Plaintiffs have suffered pecuniary, non-pecuniary losses and damages in amounts to be proved at trial.

80.    As a direct and proximate result of Allstate's violation of its fiduciary duties of good faith, fair and honest treatment, and equal consideration during the claim handling process, Plaintiffs were deprived of the peace of mind and security for which they contracted, and irrespective of any contractual duty to pay, thereby causing Plaintiffs to suffer pecuniary and/or non-pecuniary compensatory damages and losses as a result thereof in amounts to be proved at trial.

81.    Allstate's actions as alleged herein with respect to the investigation, evaluation and refusal to pay Plaintiffs' legitimate claims for first party insurance benefits were wanton, malicious, intentional, and in reckless disregard for Plaintiffs' rights amounting to a bad faith violation of its contractual and implied fiduciary duty of good faith and fair dealing, thereby entitling Plaintiffs to an award of punitive damages in amounts sufficient to punish and deter Allstate from similar conduct in the future.

## COUNT III
## VIOLATION OF THE ITPFA AND UCPA

82.    All of the general and factual allegations recited above are incorporated herein by reference.

83.    The actions of Cornejo and Allstate, as described above, constituted unfair or deceptive insurance practices in violation of NMSA 1978, Section 59A-16-3, Section 59A-16-4, and Section 59A-16-20, for which Cornejo is personally liable as well as Allstate.

BERARDINELLI
Law Firm

84. The unfair or deceptive acts of Cornejo and/or Allstate committed in violation of NMSA 1978, Section 59A-16-3, Section 59A-16-4, and Section 59A-16-20, were also committed knowingly and/or willfully and/or were committed with such frequency as to indicate a general business practice.

85. Plaintiffs has suffered damages as a result of Cornejo's and Allstate's violations of the New Mexico Insurance Trade Practices and Frauds Act, as specified above, and is entitled to bring this action under NMSA 1978, Section 59A-16-30 which also entitles Plaintiffs to an award of reasonable attorney fees for bringing this action.

86. The New Mexico Insurance Trade Practices and Frauds Act is a remedial act with a broad public purpose of encouraging ethical practices in the insurance industry. As such, its private remedy should be broadly interpreted especially in the context of the special and unique relationship existing between insurers and their policyholders.

87. Accordingly, and as a result of these willful and malicious violations in reckless disregard of Plaintiffs' rights, Plaintiffs should also be entitled, under the ITPFA and/or the UCPA, to an award of punitive damages to punish and deter similar violations in the future.

WHEREFORE, Plaintiffs pray this Court for judgment against Defendants as follows:

1. For an award of compensatory damages consisting of all contractual benefits due under the policy as payment for the losses of personal property during the burglary of their residence;

2. For an award of compensatory damages consisting of all pecuniary and non-pecuniary compensatory damages caused by Allstate's intentional and willful violation of its fiduciary duties of good faith and fair dealing owed to Plaintiffs;

BERARDINELLI
Law Firm

-18-

3.      For an award of compensatory damages consisting of all pecuniary and non-pecuniary compensatory damages caused by Allstate's intentional and willful violations of the ITPFA and the UCPA;

4.      For an award of punitive damages;

5.      For reasonable attorney fees and costs incurred herein;

6.      For an award of reasonable prejudgment interest as additional damages under both NMSA 1978, Section 56-8-3, and Section 56-8-4; and

7.      For such other and further relief as the Court may deem just under the circumstances.

Respectfully submitted,

BERARDINELLI LAW FIRM

DAVID J. BERARDINELLI, LLC
Attorney at Law
Post Office Box 1944
Santa Fe, New Mexico 87504-1944
(505) 988-9664

-19-

# Best's Rating and Report Updates for
# Allstate Insurance Company

## Best's Rating of A+ (Superior)
## Financial Size Category of XV ($2 billion or more)

**Rating Category (Superior):** Assigned to companies which have, on balance, superior financial strength, operating performance and market profile when compared to the standards established by the A.M. Best Company. These companies, in our opinion, have a very strong ability to meet their ongoing obligations to policyholders. The **Financial Size Category** is assigned to all companies and reflects their size based on their capital, surplus and conditional reserve funds in millions of U.S. dollars.

The objective of Best's rating system is to provide an opinion of an insurer's financial strength and ability to meet ongoing obligations to policyholders. Our opinions are derived from the evaluation of a company's balance sheet strength, operating performance and business profile as compared to Best's quantitative and qualitative standards. While Best's Ratings reflect our opinion of a company's financial strength and ability to meet its ongoing obligations to policyholders, they are **not a warranty**, nor are they a recommendation of a specific policy form, contract, rate or claim practice. The rating symbols "A++", "A+", "A", "A-", "B++", and "B+" are registered certification marks of the A.M. Best Company, Inc.

*Note: The above information reflects the most recent Best's Rating for this company, which may have been released subsequent to the creation of the following Best's Company Report.

Best's Company Reports provide detailed business overview, extensive financial data and analytical commentary, product and geographic information, company history, as well as the rationale supporting the financial strength rating assigned by A.M. Best. These reports are updated on a regular basis based on input and analysis performed throughout the year.

## Best Company Report Revision Date - 03/06/2002

The **Report Revision Date** represents the last significant material change made to this report. Other non-material changes may have been made to this report subsequent to this date, but are not reflected in the report revision date. The Best Company Report below was created based on the following dates.

| Rating and Commentary [1] | Financial [2] | General Information [3] |
|---|---|---|
| Best's Rating: 01/14/2002 | Time Period: 2nd Quarter - 2002 | Corporate Structure: N/A |
| Rating Rationale: 01/14/2002 | Last Updated: 09/20/2002 | States Licensed: 06/12/2002 |
| Report Commentary : 03/06/2002 | Status: Quality Cross Checked | Officers and Directors: 01/14/2002 |

*Note: The Rating and Commentary [1] date outlines the most recent updates to the Company's Rating, Rationale, and Report Commentary for key rating and business changes. Report commentary may include significant changes to Business Review, Financial Performance/Earnings, Capitalization, Investment/Liquidity, or Reinsurance sections of the report. The Financial [2] date reflects the current status of the financial tables found within the body of the Company Report, including whether the data has was loaded as received or had been run through our quality control cross-check process. The General Information [3] date covers key areas that may have changed such as corporate structure, states licensed or officers and directors.

## Best's Company Report for
## Allstate Insurance Company



Group Affiliation: Allstate Insurance Group

# ALLSTATE INSURANCE COMPANY

**3075 Sanders Road, Suite G2H, Northbrook, Illinois, United States 60062-7127**

Tel: 847-402-5000
AMB#: 02017
FEIN#: 36-0719665

Fax: 847-402-1605
NAIC#: 19232

Report Revision Date: 03/06/2002

# BEST'S RATING

Based on our opinion of the consolidated Financial Strength of the company and its insurance subsidiaries, the company is assigned a Best's Rating of A+ (Superior). The company's Financial Size Category is Class XV.

# RATING RATIONALE

The following text is derived from the report of Allstate Insurance Group.

**Rating Rationale:** The rating applies to Allstate Insurance Co. and nine of its reinsured subsidiaries and is based on their consolidation with four separately rated property-casualty subsidiaries. The rating reflects the group's superior financial strength, historically favorable operating performance and significant market presence. The group's strong capital position reflects management's conservative operating philosophies and correspondingly stable balance sheet and excellent liquidity. Further, management's commitment to capital discipline is reflected in the relatively low financial leverage maintained at The Allstate Corporation, as well as the additional liquidity provided at the holding company level through the use of available lines of credit, access to the capital markets as well as its commercial paper program. Although operating returns have declined modestly over the last two years, the group continues to compare well with its peers due to its solid underwriting capabilities and consistent stream of investment income from its well-diversified conservative portfolio. While the group's statutory underwriting expense ratio has increased modestly over the last several years, it is anticipated that modest improvement will be achieved over the intermediate-term due to its various expense reduction initiatives as well as its significant investment in technology. The group maintains an outstanding market presence and a national presence as the 2nd largest personal lines writer with an approximate 12% market share.

Allstate has implemented various strategic initiatives to enhance its operating performance, accelerate organic growth and further increase its market presence. These initiatives also provide value-added customer services and broaden its products and distribution channels. These innovative strategic initiatives include the creation of a platform that provides customers with multiple access points to sales and service capabilities through the Internet and direct call centers. This platform complements its established agencies that, during 2000, either converted to independent contractors, sold their economic interest in their books of business or retired. Further, the 1999 acquisition of Encompass Insurance (formerly CNA's personal lines business) enhanced the group's penetration within the independent agent market. The group has diversified its earnings stream in recent years through the increased presence of Allstate Financial's life products. In an effort to further improve its overall position, the group has also recently gained a full-service thrift charter for the Allstate Bank allowing the group to offer a wide range of consumer banking products. Another

ongoing endeavor is the rollout of a risk segmentation, underwriting and pricing tool – Strategic Risk Management (SRM). SRM is a comprehensive approach that coordinates the group's competitive position, marketing/retention strategies and underwriting guidelines to focus on profitability, growth and what the group defines as high lifetime value customers. Along with these initiatives, advertising spending has also increased to reinvigorate and leverage its long-standing brand as "The Good Hands" company, as well as the rollout of Encompass.

Offsetting these positive rating factors is the group's recent modest deterioration in operating performance, continued execution risk with regard to its strategic initiatives and on-going exposure to frequent and severe weather related losses. The decline in operating performance over the last two years has been driven by increasing loss costs, intense pricing competition in the automobile sector and increasing frequency and severity trends on its homeowners book of business. Although still strong, particularly when compared to its personal lines peers, returns have fallen from their historic double-digit levels. With its recent pricing actions as well as the implementation of Strategic Risk Management, the group should continue to see improvement in its automobile line. The group plans to continue its aggressive actions with regard to the homeowners book of business, including rate increases, revised underwriting guidelines and product enhancements. However, given that the homeowners policy is annual, the impact of these changes will take several years until the rate increases have been earned. Although the group continues to successfully execute its various strategic initiatives, modest execution risk remains.

## FIVE YEAR RATING HISTORY

| Date | Best's Rating |
|---|---|
| 01/14/02 | A+ g |
| 03/13/01 | A+ g |
| 11/08/99 | A+ g |
| 06/08/98 | A+ g |

## KEY FINANCIAL INDICATORS

| | Statutory Data ($000) | | |
|---|---|---|---|
| Period Ending | Direct Premiums Written | Net Premiums Written | Pretax Operating Income |
| 1997 | 13,245,150 | 18,117,314 | 2,595,653 |
| 1998 | 13,388,703 | 18,637,750 | 2,906,777 |
| 1999 | 12,976,249 | 19,650,992 | 1,747,640 |
| 2000 | 13,033,402 | 20,430,834 | 1,565,037 |
| 2001 | 13,352,807 | 20,706,989 | 1,109,170 |
| 06/2001 | 6,580,223 | 10,210,540 | 487,809 |
| 06/2002 | 6,777,884 | 10,769,982 | 801,756 |

| | Statutory Data ($000) | | |
|---|---|---|---|
| Period Ending | Net Income | Total Admitted Assets | Policy-holders' Surplus |
| 1997 | 2,557,261 | 36,783,255 | 12,943,470 |

| | | | |
|---|---|---|---|
| 1998 | 2,960,492 | 37,176,125 | 13,400,712 |
| 1999 | 1,963,741 | 37,880,370 | 12,711,876 |
| 2000 | 1,687,260 | 37,428,667 | 12,721,639 |
| 2001 | 994,282 | 37,800,588 | 13,772,727 |
| 06/2001 | 458,555 | 37,913,659 | 13,729,143 |
| 06/2002 | 678,845 | 38,678,265 | 13,752,922 |

| | Profitability | | | Leverage | | | Liquidity | |
|---|---|---|---|---|---|---|---|---|
| Period Ending | Comb. Ratio | Inv. Yield (%) | Pretax ROR (%) | NA Inv Lev | NPW to PHS | Net Lev | Overall Liq. (%) | Oper. Cash-flow (%) |
| 1997 | 97.0 | 5.8 | 14.4 | 58.0 | 1.4 | 3.2 | 155.1 | 112.6 |
| 1998 | 95.3 | 5.4 | 15.6 | 53.4 | 1.4 | 3.1 | 157.3 | 108.2 |
| 1999 | 99.4 | 5.4 | 9.4 | 58.2 | 1.5 | 3.5 | 151.2 | 109.1 |
| 2000 | 102.0 | 5.3 | 7.6 | 54.0 | 1.6 | 3.5 | 152.1 | 103.3 |
| 2001 | 104.6 | 5.9 | 5.4 | 44.9 | 1.5 | 3.2 | 157.7 | 99.8 |
| 5Yr Avg | 99.8 | 5.6 | 10.3 | ... | ... | ... | ... | ... |
| 06/2001 | 105.0 | XX | 4.9 | XX | 1.5 | 3.3 | 157.4 | 95.0 |
| 06/2002 | 101.7 | XX | 7.6 | XX | 1.5 | 3.4 | 155.6 | 106.3 |

(*) Data reflected within all tables of this report has been compiled from the company-filed statutory statement. Within several financial tables of this report, this company is compared against the Private Passenger Auto & Homeowners Multiple Peril Industry Composite.

# BUSINESS REVIEW

The following text is derived from the report of Allstate Insurance Group.

Collectively, the ten-company property / casualty group, led by Allstate Insurance Company, writes multiple lines of personal and commercial insurance throughout the United States and in Canada. The group's mix of business was split approximately 95% personal lines and 5% commercial lines in 2000. Primary lines of business are private passenger automobile and homeowners insurance which represent approximately 75% and 21% of Allstate's total book of property / casualty business, respectively. The group is a market leader in private passenger automobile and homeowners insurance in terms of size, pricing and name recognition with approximate national market shares within these segments of 13.3% and 12.9%, respectively.

With personal automobile lines serving as an entree, agents are capable of cross-selling other products to policyholders, including homeowners insurance, commercial lines (generally to small and medium sized accounts) and personal financial products. Having multiple products for agents to sell has historically been instrumental in Allstate achieving high agent, as well as customer retention.

## 2001 BUSINESS PRODUCTION AND PROFITABILITY ($000)

| | % of | Pure | Loss |
|---|---|---|---|